## IVA IKUKO TOGURI D'AQUINO v. UNITED STATES.
### No. 12383.

United States Court of Appeals
Ninth Circuit.
Oct. 10, 1951.

See also, 9 Cir., 180 F.2d 271.

Wayne M. Collins, Theodore Tamba, George Olshausen and Marvel Shore, all of San Francisco, Cal., for appellant.

Frank J. Hennessy, U. S. Atty., San Francisco, Cal., James M. McInerney, Asst. Atty. Gen., Tom De Wolfe, James W. Knapp, Sp. Assts. to the Atty. Gen., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

Appellant was convicted of treason against the United States. The indictment charged that she adhered to the enemies

of the United States giving them aid and comfort by working as a radio speaker, announcer, script writer and broadcaster for the Imperial Japanese Government and the Broadcasting Corporation of Japan, between November 1, 1943, and August 13, 1945; that such activities were in connection with the broadcasting of programs specially beamed and directed to the American Armed Forces in the Pacific Ocean area; and, that appellant's activities were intended to destroy the confidence of the members of the Armed Forces of the United States and their allies in the war effort, to undermine and lower American and Allied military morale, to create nostalgia in their minds, to create war weariness among the members of such armed forces, to discourage them, and to impair the capacity of the United States to wage war against its enemies. The indictment alleged the commission of eight overt acts. Appellant was found guilty of the commission of overt act No. 6 only, which in the language of the indictment, was: "That on a day during October, 1944, the exact date being to the Grand Jurors unknown, said defendant, at Tokyo, Japan, in a broadcasting studio of the Broadcasting Corporation of Japan, did speak into a microphone concerning the loss of ships."

█ · Upon this appeal counsel for appellant have filed briefs asserting the commission of numerous errors on the part of the trial court. Their briefs, however, have overlooked this Court's Rule 20d relating to the requirement of a specification of errors and the manner in which the same shall be stated. The failure to comply with this rule has added materially to the task of the court in attempting to evolve from very lengthy briefs the precise contentions made by the appellant, and we take this occasion to call the attention of the members of the Bar of this Court to the fact that the rule is designed to clarify counsel's presentation of an appeal as well as to lighten the labors of the court.

Appellant's contentions fall into two categories: the first, it is asserted, call for a judgment that the defendant-appellant must be discharged; the second relate to alleged errors which would require a new trial.

1. Whether the applicable clause of the Act relating to treason was unconstitutional as applied to appellant.

At the outset appellant contends that those provisions of the treason statute, 18 U.S.C.A. § 1, 1946 Ed.[1] under which she was convicted were void and wanting in due process under the Fifth Amendment by reason of the co-existence of those provisions of the Nationality Act of 1940, 8 U.S. C.A. § 501 et seq., which repealed the former expressed prohibition against expatriation in time of war. In consequence of this, says appellant, the law provided that a person in like position as appellant, might · lawfully have been naturalized to an enemy belligerent, and that under the Government's naturalization policy the appellant could, as many other persons of Japanese ancestry did, have transferred allegiance to Japan. Appellant says that a person desiring to adhere to the enemy and give it aid and comfort, and wishing · to do a thorough-going job of it, could shed his allegiance to the United States under existing law and thus engage in adherence, aid and comfort to the enemy with impunity. On the other hand, says appellant, she is charged with treason for having done no differently than the person who transferred allegiance. It is said that this constitutes an unreasonable and arbitrary discrimination; that it operates as a denial of equal protection of the law to such a degree as to be a denial of due process under the Fifth Amendment.

Putting the argument in a slightly different form, appellant says that in permitting wartime naturalization to an enemy belligerent, the United States authorized adherence, aid and comfort to the enemy under certain circumstances. It is said that by permitting adherence to Japan after naturalization, the Japanese naturalization order is treated as the equivalent of a license.

In other words, it is said one person adheres to the enemy giving it aid and comfort without any consequences under the

1. 1948 Revised Criminal Code, 18 U.S.C.A. § 2381.

treason act because he has a Japanese naturalization order which is in effect a license to adhere to the enemy. Another person, without such an order, is therefore engaged in no more than an unlicensed adherence to the enemy. It is said that punishment of treason cannot be limited merely to unlicensed adherence, aid and comfort because Article III, Section 3, of the Constitution, defining treason provides that it "shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort." This clause, it is said, means that treason shall consist only of adherence, aid and comfort, *as such*. Limiting punishment for treason to unlicensed adherence, aid and comfort, means adding limitations and qualifications not contemplated by the Constitutional definition of treason.

█ We are unable to perceive any sound basis for such an argument. The reference to licensed and unlicensed adherence to the enemy is, we think, but a play on words. The classification here, of which appellant complains, is none other than the ancient distinction drawn between those who do and those who do not owe allegiance.[2]

Whether the provisions of the Nationality Act which appellant thinks work unfairly represent a wise or sound legislative policy is a problem for Congress, not for us. We are unable to observe anything unreasonable or arbitrary about preserving the ancient distinction between those who do and those who do not owe allegiance regardless of whether the transfer of allegiance could be made in wartime or not. Reasons both historical and logical exist for the distinction and we find no want of due process here.

2. The question of a speedy trial.

Appellant asserts that she was denied the speedy trial required by the Sixth Amendment and that such denial requires her discharge. Her argument in this respect is predicated upon the circumstance that after the defeat of Japan the occupying military force caused appellant's arrest and internment for the period of approximately one year from October 17, 1945, until October 25, 1946. This arrest was pursuant to an order of the Commander-in-Chief of the Armed Forces of the Pacific authorizing the Commanding Generals of the occupying forces to apprehend and detain citizens and nationals of the United States who were suspected of treason and persons who might constitute a threat to the security of the military forces occupying Japan.

On May 7, 1946, a military order was made to the effect that the appellant was not considered subject to a military trial, but that she was being held until the results of the military investigations were transmitted to the Department of Justice. Immediately prior to her release on October 25, 1946, the War Department advised the Army authorities in Japan that the "Department of Justice no longer desires Iva D'Aquino be retained in custody" and her release followed. Thereafter, on August 26, 1948, the appellant was arrested at Tokyo pursuant to a warrant of arrest issued under the authority of the Supreme Command for the Allied Power. It was issued upon the complaint of the Department of Justice. She was brought to the United States under guard of military police acting under orders from General Headquarters Far East Command who took her on board a United States Army Transport which arrived in San Francisco on September 25, 1948, when she was delivered to special police of the Federal Bureau of Investigation. She was arraigned on the same day in San Francisco and indicted on October 8, following.

█ There is nothing in the record to disclose failure on the part of the United States to prosecute the charge against appellant with reasonable promptness following the date of her arrest on August 26, 1948. The record is barren of any demand for a speedy trial. Danziger v. United States, 9 Cir., 161 F.2d 299, 301, certiorari

---

2. Title 18, § 1, Criminal Code, (1946 Ed.): "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason."

350

denied 332 U.S. 769, 68 S.Ct. 81, 92 L.Ed. 354. Appellant obtained an order permitting one of her attorneys to go to Japan for the purpose of taking depositions at Government expense and she obtained a continuance of the trial date to permit the completion of that task. Under these circumstances there cannot be said to be a denial of a speedy trial. Daniels v. United States, 9 Cir., 17 F.2d 339, 344, certiorari denied Appell v. United States, 274 U.S. 744, 47 S.Ct. 591, 71 L.Ed. 1325.

■ Appellant however says that her military detention in Japan in the year following October, 1945, demonstrates that she was denied a speedy trial. We shall have occasion to refer to the character of the detention later in this opinion, but wholly apart from whether that detention was or was not in accordance with law, it has no bearing whatever upon the question of her right to a speedy trial, which is one that arises after a formal complaint is lodged against the defendant in a criminal case.

■ In this connection appellant makes an alternative contention based upon this prior imprisonment,—that such prior imprisonment constitutes former jeopardy. This contention obviously is without any basis whatever. McCarthy v. Zerbst, 10 Cir., 85 F.2d 640, certiorari denied 299 U.S. 610, 57 S.Ct. 313, 81 L.Ed. 450; Wainer v. United States, 7 Cir., 82 F.2d 305, affirmed 299 U.S. 292, 57 S.Ct. 79, 81 L.Ed. 58;

Dixon v. United States, 8 Cir., 7 F.2d 818; United States v. Rossi, 9 Cir., 39 F.2d 432.

### 3. Loss of scripts and records.

Appellant asserts that this year's imprisonment in Japan must be considered in conjunction with the fact that certain scripts, records, and copies of appellant's broadcasts were destroyed or lost before the date of the trial, and that under all these circumstances it is a denial of due process for the United States to prosecute her when such scripts and records were unavailable. Appellant contends that under the doctrine of Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, a deliberate suppression of the evidence on the part of the prosecution is a denial of due process. She contends that such is the situation here where the Government knowingly prosecuted a case upon incomplete evidence. She asserts that there is good reason to believe that the missing evidence would be favorable to her and that the evidence became unavailable because of the Government's own acts since the Government originally had a complete set of the records and copies of the broadcasts compiled in its various monitoring stations.

■ We think there is no basis for this contention on the part of appellant. There is no showing that the missing scripts and records would have been favorable to the defense or that the Government suppressed any of such evidence.[3] We find nothing in

3. Appellant contends that if all the scripts and records made of the Zero Hour broadcast had been produced, they would have disclosed that the contents of the Zero Hour broadcasts were completely harmless. Appellant bases this contention and the contention that there is good reason to believe that the missing evidence contained in such scripts would be favorable to defendant, upon her assertion that the 13 exhibits which were scripts or records of the Zero Hour broadcast, "showed no propaganda whatever; instead they consist of the introduction to music done in the manner of a night club master of ceremonies." Reference to some of the scripts actually produced disprove this assertion. Thus the stenographic report of the records introduced as exhibits 63 and 75 disclose that those broadcasts, after proceeding

for most of the hour with musical entertainment, wound up with the kind of propaganda which many of the witnesses for the Government described from their recollections. Thus the conclusion of exhibit 75 was as follows: "This is still the 'Zero Hour' calling in the Pacific on the nineteen and twenty-five meter bands. (Voice—with dramatic background music) There's something mighty funny about all these navy bigshots resigning. First, there are all these admirals of the different fleets who got relieved of duty. Then there's a hell of a big shift in high positions. I didn't think much about it at the time. I thought it was only routine changes, but now the Secretary of the Navy Forrestal and the Undersecretary of Navy Ralph (Powers) have sent in their resignations. Now the whole navy is trying to get away from (this

the record to warrant an assumption that the prosecutor did not produce all such scripts and records as were available. Further, there is nothing to negative the Government's contention that the monitoring station records previously kept had been destroyed or lost in the process of the routine closing of such stations.

### 4. The "posse comitatus" Act.

■ The jurisdiction of the court below was based upon 18 U.S.C.A. § 3238 which provides: "The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought." Appellant asserts that the court below was without such jurisdiction in that she was brought from Japan to San Francisco in an illegal and unlawful manner by the military authorities in violation of the so-called "posse comitatus" Act, 20 Stat. 152, 10 U.S.C.A. § 15. This is the same argument that was made unsuccessfully in Chandler v. United States, 1 Cir., 171 F.2d 921, 936, and in Gillars v. United States, 87 U.S.App.D.C. 16, 182 F.2d 962, 972, 973. For the reasons stated in those cases, we hold this argument without merit.

### 5. Question of the sufficiency of the evidence.

Appellant argues that we should direct a judgment of acquittal on the ground that the evidence was insufficient to sustain a conviction. With respect to this, the record discloses that at the time of the commission of overt act No. 6, of which appellant was found guilty, she was unquestionably a citizen of the United States. She was born

war?). Although President Truman has accepted (Powers'?) resignation, he says he ain't got no intention of accepting Forrestal's quittin' papers. He said that Forrestal's resignation was submitted as routine after the death of President Roosevelt, but I'm thinkin' that there's more to it than that. Now why should they change horses in the middle of the stream when everything is going smoothly? Or is everything going along smoothly? Maybe that's why Forrestal wants to quit. He don't want to take the responsibility of the big naval losses in this Okinawa campaign. Now the Secretary of the Navy is supposed to be the top man in the navy next to the president, and so he should stick to his guns 'til the last shot is fired or the last ship is sunk or somethin' like that. But what I mean is that he should see the thing through to the very end. He ain't got no more right to send in a resignation than the next one, or maybe he can't take it. Maybe the beatin' the navy took in the Okinawa campaign was too much for him; the blood of too many men and officers and the destruction of too many ships was on his hands, and so he wanted to quit. But after all, he's a civilian and he's got a perfect right to quit. He ain't like you or me, buddy. We try somethin' like that and it's court [martial] for us. According to Nimitz, there was only twenty-five ships sunk during the Okinawa campaign and if that's so, I say that that was pretty darned good because you gotta expect casualties in any kind of fight and for large scale fightin' like the Okinawa blowout, I say that twenty-five ships sunk is not so bad. But then you know Nimitz. He don't like big figures. By taking what he says, you multiply it by ten and get closer to the right figure. But in the case of the Okinawa navy casualties, it seems that you gotta multiply it by fifty to get the right figure. Now according to the announcement made by the Japanese side, more than five hundred and fifty ships were done for and even if they like to talk in big figures there's too much difference between their figure and the one Nimitz gives. Now I got it figured out that that's the answer to all the changes among the big shots and the resignation of the navy cabinet members. I think that the navy took a bigger beatin' than Nimitz cares to admit. That's the only way I can figure it out. In the first place, you (and me?) who's been around the Pacific all this time have a pretty fair sample of how the Japanese fight, and you can't tell me that there's only twenty-five ships sunk during that campaign. And so the Japanese figures that there's over five hundred and fifty ships done for would be closer to the truth. But that's all right for the big shots. They can quit or be replaced when things get tough, but as I have said, you just try it and see what happens."

While this conclusion was not read by appellant, the evidence shows she did participate in the same broadcast at an earlier stage.

and educated in the United States and a few months prior to the outbreak of the war with Japan she had gone to Japan for the purpose of studying medicine. Previously she had received a college degree and had taken postgraduate work in a California university. Shortly before the outbreak of the war she applied for a passport to return to the United States and was advised by the State Department that the passport was denied on the ground that her citizenship was not proven (she had traveled to Japan upon a "certificate of identification"). She endeavored to get clearance to board a ship scheduled to sail for the United States on December 2, 1941, but was unsuccessful. Early in 1942 she applied for evacuation through the Swiss Legation but encountering difficulties in procuring certification of her United States citizenship she abandoned this attempt. Thereafter, and throughout her period of residence in Japan and while the war continued, she was frequently invited to become a Japanese citizen but steadfastly refused. In the spring of 1945 she married D'Aquino, a Portuguese citizen. The marriage was subsequent to the date of the commission of the overt act No. 6.

After having been employed in various jobs in 1942 and in the early part of 1943, appellant sought employment at Radio Tokyo and began her work as a typist for the Broadcasting Corporation of Japan in the fall of 1943. Shortly thereafter she began her broadcast work for this corporation which was under the control of the Japanese Government. There is evidence in the record that when the appellant took her voice test and accepted employment as an announcer and broadcaster for Radio Tokyo she knew that her work was to be concerned with a program known as "Zero Hour" which was to be beamed and directed specially to Allied soldiers in the Pacific. She was told and understood that the program would consist of music and entertainment designed to procure a listening audience among Allied soldiers, and that there was to be interspersed news and commentaries containing propaganda which was to be used as an instrument of psychological warfare. Their object was to cause the Allied troops to become homesick, tired and disgusted with the war.

Appellant participated in some 340 programs on the Zero Hour. She announced herself as "Ann" or "Orphan Ann". From time to time she attended meetings of the participants in the Zero Hour program where the Japanese Army officers in command of the enterprise advised the persons present of the strategic importance of the program and urged continued efforts by the participants.

The overt act No. 6 was testified to by the requisite number of witnesses who observed and listened to the broadcast in question. One of them was a participant in the same Zero Hour program. He told the appellant of a release from Japanese General Headquarters giving the American ship losses in one of the Leyte Gulf battles and requested appellant to allude to those losses. She proceeded, as this witness and another testified, to type a script about the loss of ships. That evening, when appellant was present in the studio, the news announcer broadcast that the Americans had lost many ships in the battle of Leyte Gulf. Thereupon appellant was introduced on the radio and proceeded to say in substance: "Now you fellows have lost all your ships. You really are orphans of the Pacific. Now how do you think you will ever get home?"

It is true that the appellant's version of her role as a broadcaster was substantially different from that which we have here summarized from the testimony of the Government witnesses. According to appellant's version of the matter, the programs were exclusively entertainment and for that purpose only, she having been informed by the officer in command that the time for propaganda would not arrive until the Japanese were having more military and naval successes. Some of appellant's witnesses testified that they were responsible for having her brought into the Zero Hour program. These persons were American prisoners of war who testified that they had been coerced into participation in this program. They testified that what they were up to was a sabotaging of the program insofar as it was designed to be propaganda to American soldiers, that they managed to

inject in the program many reports of American prisoners of war and messages from them, and that the appellant co-operated with them in their efforts to frustrate the purposes of the Japanese military operating through the broadcasting corporation to destroy the morale of the American soldiers.[4]

■ Whether appellant's version of her activities in broadcasting should be accepted rather than that disclosed by the Government witnesses was, of course, a question for the jury. Insofar as it is contended that the program was merely one to entertain the American troops, such a version of the evidence would, we have no doubt, tax the credulity of a jury who would be hard put to imagine the Japanese military spending time and money solely for that purpose.

Appellant's counsel do not argue that we must accept her version of the testimony. They make the rather narrow point that other activities of the appellant, concerning which witnesses on both sides testified, were such as to require a conclusion that there existed reasonable doubt of appellant's intention to adhere to the enemy and reasonable doubt of her treasonable intent.

These activities were certain acts of kindness and assistance which appellant rendered to Allied prisoners of war, some of whom were working with her on Radio Tokyo, and some of whom were imprisoned at Camp Bunka. The testimony was that she brought food, cigarettes, medicine, a blanket and short wave news of Allied successes to these prisoners, and that she did this frequently at substantial risk to herself.

We are unable to perceive the force of appellant's argument in this respect. A general treasonable intent to betray the United States through the impairing of its war effort in the Pacific, might well accompany a particular feeling of compassion toward individual prisoners and sympathy for the plight in which they found themselves. It is were psychologically impossible for a person engaged in a treasonable enterprise simultaneously to furnish cigarettes and food to individual prisoners, appellant's argument upon this point might have some weight. We think that the question of the effect of these acts of kindness upon appellant's intent was one for the jury. Certainly, under the circumstances here, the court cannot declare that there must be a reasonable doubt in a reasonable mind and hence direct a verdict. The question of the existence of a reasonable doubt was for the jury. Cf. Craig v. United States, 9 Cir., 81 F.8d 816, 827, certiorari denied 298 U.S. 690, 56 S.Ct. 959, 80 L.Ed. 1408.

4. Witnesses who identified the appellant's voice testified to sundry broadcasts by her which would fall in the psychological warfare pattern claimed by the Government to have been followed by the appellant. Included were broadcasts that "Joe Brown was out with Sally Smith. He is a rejectee who is getting the cream of the crop while you Joes are out there knocking yourselves out"; "What are your wives and sweethearts doing?" and "Wouldn't it be nice to be home now, driving down to the park and parking and listening to the radio a while"; "Why don't you kick in now? There's no hope. You can be treated right by the Japanese people. When the Japanese finally take over they are not going to be hard on you"; "The Japanese were kicking hell out of the American troops in Tacloban, and that by New Year's Day the Japanese would be in Palau"; "There is no sense in being out there in those mosquito infested islands, perhaps getting yourselves killed"; "The Island of Saipan was mined with high explosives, and that the Americans would be given forty-eight hours to clear off the island, and that if they did not, the island would be blown sky high"; "I wonder who your wives and girl friends are out with tonight? Maybe a 4F. Maybe someone working in a war plant making big money, while you are out here fighting, knowing you can't succeed"; "Wake up you boneheads. Why don't you see your commanding officer and demand to be sent home? Don't stay out in that stinking mosquito infested jungle and let someone else run off with your girl friend"; "You boneheads—if you boneheads want to go home, you had better leave soon. Haven't you heard? Your fleet is practically sunk"; "You know the boys at home are making the big money and they can well afford to take your girl friends out and show them a good time".

### 6. Admissibility of so-called "confessions".

During the trial, a number of statements made to various persons by appellant were received in evidence and appellant contends that the court erred in admitting such statements for the reason that they were confessions and received as such contrary to the rules stated in Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568, and in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, as restated in Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100. It is asserted that there was wanting sufficient proof that the statements were voluntary within the meaning of the rule in the Bram case; in some cases the statements were inadmissible because they were made at a time when appellant was being held under arrest and prior to arraignment upon the charge subsequently made against her; and further, that the statements made while she was held in custody were inadmissible under the rule in the McNabb case because the Government is attempting to make use of the fruits of its own wrong.

One of the written statements thus given during appellant's confinement or internment in Japan was the result of an interrogation by an agent of the Federal Bureau of Investigation on April 29–30, 1946, in the visitors' room at Sugamo Prison where appellant was then confined. We have previously alluded to this period of imprisonment and it will be noted that on the dates mentioned she had been confined for a period of approximately six months. Appellant argues that under the McNabb and Upshaw doctrine, this statement was inadmissible.[5]

An application of the McNabb-Upshaw rule to the facts of this case suggests some problems which we think need not be here resolved. The rule, predicated upon a violation of the procedural requirements of 18 U.S.C.A. § 595, and its successor Rule 5(a) F.R.Crim.P., 18 U.S.C.A., is ob-

viously a sanction enforced, pursuant to the supervisory power of the Supreme Court against civil officers making arrests for criminal offenses. Since Rule 5(a) could have no application to the conduct of the military forces occupying Japan, the question of application of this sanction in this case is not too clear. Appellant asserts that Article 70 of the Articles of War [6] places a similar procedural burden upon military forces in this case. It is our opinion, however, that the appellant was not within any category of persons subject to the Articles of War; that she was neither a retainer to the camp nor a person accompanying or serving with the Armies. Articles of War, Article 2, 10 U.S.C.A. 1473; cf. In re Yamashita, 327 U.S. 1, 20, 66 S.Ct. 340, 90 L.Ed. 499.

The McNabb and Upshaw cases have no application here for the reason that appellant's detention was legal and authorized by the laws of war. "The right of one belligerent to occupy and govern the territory of the enemy while in its military possession is one of the incidents of war, and flows directly from the right to conquer. We therefore do not look to the Constitution or political institutions of the conquerer for authority to establish a government for the territory of the enemy in his possession, during its military occupation, nor for the rules by which the powers of such government are regulated and limited." Dooley v. United States, 182 U.S. 222, 230, 231, 21 S.Ct. 762, 765, 45 L.Ed. 1074, quoting Halleck on International Law, Vol. II, p. 444, cited in Gillars, supra, 182 F.2d at page 972.

■ It is apparent that at the time of appellant's interrogation by the agent of the Federal Bureau of Investigation her detention was pursuant to the exercise of military power. Appellant was a resident of a country occupied by the United States military forces who had exacted an unconditional surrender from the enemy. The cessation of actual hostilities had occurred

---

5. See reference to this question in D'Aquino v. United States, 9 Cir., 180 F.2d 271.

6. 10 U.S.C.A. § 1542, at the time of appellant's detention, provided: "When any person subject to military law is placed in arrest or confinement immediate steps will be taken to try the person accused or to dismiss the charge and release him. . . ."

only slightly more than one month before appellant was taken into custody. We take judicial notice that the situation then existing in Japan was somewhat parallel to that in Austria as described in United States v. Best, D.C., 76 F.Supp. 857, 863. While open warfare had ceased, the security of the occupation forces was a continuing problem confronting the military commanders. Appellant was a suspected traitor. That she might be capable of fomenting disorder among the Japanese population then being subjected to the yoke of military occupation, and of inciting discontent among the troops of the occuping powers was a sufficient basis for the military to take the precautionary measure of interning appellant. The paramount interest of the occupation force is its own security. We see no abuse of military discretion in the protection of that interest.[7] We hold that the confinement was within the constitutional sanction of the war power; the restraint was legal, and the admission in question was not the fruit of an unlawful detention and was properly received in evidence.

■ Another writing obtained while appellant was interned in this manner was a Japanese yen note signed "Iva I. Toguri 'Tokyo Rose'". It is claimed that this amounted to a confession and was not receivable for the same reasons urged with respect to the statement made to the Federal Bureau of Investigation previously mentioned. Not only do we consider this objection groundless for the reasons stated with respect to that statement, but it is apparent that the signed yen note was not a confession nor was it introduced as such. It was introduced early in the trial for the purpose of proving the appellant's signature. It is contended that the document was received for the purpose of establishing her admission that she was "Tokyo Rose". There was no attempt at the trial to identify the appellant as "Tokyo Rose", as all of the evidence disclosed that she broad-cast as "Ann" or "Orphan Ann". The inclusion of the reference to Tokyo Rose in the signature on the yen note could under no circumstance be regarded as prejudicial to the appellant.

■ It is contended that wholly apart from the McNabb-Upshaw rule these and other so-called confessions were inadmissible because of a failure to establish their voluntary character.[8] The necessary foundation of preliminary proof of voluntary character of these statements was laid in each case. Thus the FBI officer previously mentioned, testified that he identified himself to appellant, advised her of her right to counsel, and of her right to decline to talk to him, and testified that no threats or promises of any kind were made to her. The circumstances of the interviews, which took place over a two day period, negative any inference of oppression or anything else inconsistent with the voluntary character of the statement. The mere fact of a lawful imprisonment does not render such a confession inadmissible. LaMoore v. United States, 9 Cir., 180 F.2d 49.

The other so-called confessions which appellant asserts were erroneously admitted were obtained at times when appellant was not interned or under arrest. She gave an oral interview to the military personnel assigned to the Army publication "Yank" magazine. Appellant says that the statement was coerced because she was interviewed by uniformed soldiers who told her that she "owed it" to the publication, and that giving one interview to a large number of newspaper correspondents at a single time would permit her to avoid being "badgered" by individual correspondents. This interview preceded by two days an interrogation by two members of the Counter Intelligence Corps and it is asserted that the same coercion affected both interviews.

■ These statements were properly admitted in view of the fact that appellant

---

7. See Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774.

8. It is doubtful whether any of the statements here referred to were confessions.

Rather they were in the nature of admissions as they contained no confession of guilt and some of them were full of exculpatory statements.

voluntarily attended in each case, was accompanied by her husband, and made her statement without any threats or coercion whatsoever. No factor is present which would tend to characterize these statements as involuntary.

■ Equally without ground is appellant's objection to the evidence of her interview with a war correspondent, Clark Lee. The interview occurred before appellant's internment. Later, on March 26, 1948, after she had been released from military custody, she signed the notes of the interview. She claims that she was coerced in both instances. The only circumstance suggesting coercion is the fact that when the interview was given the door was locked to keep other rival correspondents out of the rooms. At the time of the original interview appellant was attended by her husband and a friend. The interview lasted for about five hours with interruptions for "tea, cigarettes and things of that sort". Two newspaper correspondents were present; they were in uniform and there were firearms in the room. The evidence shows no force or threats of force, no physical coercion of any kind, and no circumstances which would be unusual in a case where a newspaperman has purchased an interview which he is attempting to keep exclusive.

At the time the notes were signed by appellant, an army vehicle was sent to bring her to General Headquarters for this purpose. Appellant was informed by an official of the Department of Justice who was then present that she most probably would be prosecuted for treason and that she did not have to make any statements.

The appellant did testify that Brundidge, one of the newspaper correspondents, told her on this last occasion when she signed the notes, that her opportunity to return to the United States would be enhanced if she signed them. Brundidge was not a "person in authority".[9] That there was no promise of leniency is apparent because of

the statement simultaneously made that she probably would be prosecuted for treason.

7. Instruction relating to voluntariness of so-called confessions.

Related to the matters just discussed is the appellant's contention that the court should have permitted the jury itself to pass upon the question whether the so-called confessions were voluntary or involuntary with an instruction that if they found them to be involuntary they should disregard them.

■ In view of the want of any substantial evidence tending to show that the confessions or any of them were involuntary, it would appear that there was no need for such an instruction. Stillman v. United States, 9 Cir., 177 F.2d 607, 619; Lewis v. United States, 9 Cir., 74 F.2d 173, 178. In any event, in order to predicate error upon the failure of the court to submit such a question to the jury, appellant must under Rule 30, F.R.Crim.P., point out the claimed omission from the charge to which she objects before the jury retired. The rule requires that such an appellant state "distinctly the matter to which he objects and the grounds of his objection."

■ At the time when counsel for appellant were given the opportunity, called for by Rule 30, to make their objection to the court's charge, they did not call the court's attention to the specific point now argued, and failed to state in so many words that they requested the court to submit the question of the voluntariness of the confessions to the jury. What they said was simply "we except to the refusal of each of the following numbered instructions on the ground that each of the instructions states the correct law and is applicable to the evidence and not covered by other instructions." This statement was followed by the enumeration of 128 separate numbers identifying instructions that had been requested by appellant. Included in this enumeration was appellant's request-

9. Wigmore, Evidence (3d Ed.) § 830 (3). Cf. Steiner v. United States, 5 Cir., 134 F.2d 931, 935, certiorari denied 319 U.S. 774, 63 S.Ct. 1439, 87 L.Ed. 1721, holding that an offer by a member of the Board of Governors of a state bar asso-

ciation to lend his personal influence to secure leniency for the suspect was not such an inducement as to render statements made by the suspect to him inadmissible.

ed instruction No. 88.[10] If we assume that this wholesale blanket method of noting objections to the court's charge was a sufficient compliance with Rule 30, an examination of the requested instruction 88 discloses that it was entirely too broad, for it was not directed to the alleged confessions, but referred to "various alleged statements by defendant as well as records of her voice test." On the face of it, the requested instruction would comprehend all statements of the defendant of every kind whatever. It would comprehend statements made by her during the broadcast. It would include statements made by her not by way of confession or admission but which were received in evidence for their bearing as circumstantial evidence upon her intent. By its terms the instruction would apply to every oral or written statement attributed to the appellant by any witness. In such form it was properly rejected.

8. Requested instruction concerning proof of corpus delicti.

▆▆▆▆▆ Another instruction requested by appellant and which bore upon the appellant's admissions or so-called confessions, was defendant's proposed instruction No. 30a as follows: "You cannot consider the defendant's admissions upon any of the issues of (1) citizenship (2) aid and comfort or (3) intention unless you first find that the Government has introduced other credible corroborative evidence on the same issue. Pearlman v. U. S., 10 F.2d 460, 461, 462 (CCA 9). Goff v. U. S., 257 F. 294 (CCA 8)." We think there was no occasion for giving any such instruction here where there was substantial proof of the corpus delicti wholly apart from the admissions or confessions. The reference to the admissions relative to citizenship was erroneous for some of the appellant's admissions rela-

tive to her citizenship were made prior to the commission of the alleged offense. Such admissions need not be corroborated. Warszower v. United States, 312 U.S. 342, 347, 61 S.Ct. 603, 85 L.Ed. 876. This court has held that it is unnecessary to make full proof of the corpus delicti independently of the defendant's confessions. Wynkoop v. United States, 9 Cir., 22 F.2d 799; Wiggins v. United States, 9 Cir., 64 F.2d 950, certiorari denied 290 U.S. 657, 54 S.Ct. 72, 78 L.Ed. 569. The corroborative evidence need not independently establish the corpus delicti beyond a reasonable doubt. It is sufficient if the corroborative evidence, when considered in connection with the confession or admission, satisfied the jury beyond a reasonable doubt that the offense was in fact committed. In Pearlman v. United States, 9 Cir., 10 F.2d 460, this court indicated that the usual instructions on presumption of innocence and reasonable doubt adequately covered all that the jury need be told upon this question of sufficiency of proof of the corpus delicti. We find no error in the court's failure to give the requested instruction mentioned.

9. Questions relating to duress.

▆▆▆▆ Appellant asserts that the trial court committed numerous errors relating to the claimed defense of duress or coercion. She argues that some of the instructions given upon this subject were erroneous; that other instructions requested by her should have been given, and that the court erred in excluding numerous items of evidence which were offered in support of this defense. The court instructed the jury at length upon the defense that the criminal act was not committed voluntarily but was the result of coercion, compulsion or necessity.[11] The instruction included the state-

10. "Defendant's Proposed Instruction No. 88. Various alleged statements by the defendant as well as records of voice tests have been admitted into evidence for your consideration. Before you deal with these from any other standpoint you must first determine whether the defendant made each of these voluntarily and of her own free will not acting either under inducement or threats. If

as to any you do not find that the Government has shown the statement to have been made voluntarily, then you must discard any such alleged statement from your consideration of the case. Bram v. U. S., 163 [168] U.S. 532 [18 S.Ct. 183, 42 L.Ed. 568]."

11. This portion of the instruction was as follows: "Since every crime requires a voluntary mind, it may be a defense to a

ment that "in order to excuse a criminal act on the ground of coercion, compulsion or necessity, one must have acted under the apprehension of immediate and impending death or of serious and immediate bodily harm. Fear of injury to one's property or remote bodily harm do not excuse an offense." It will be noted that the court's instruction was almost identical to that approved in Gillars v. United States, supra, 182 F.2d at page 976, note 14. The charge was a correct statement of the law upon this subject. United States v. Vigol, 2 Dall 346, 2 U.S. 346, 1 L.Ed. 409; Respublica v. McCarty, 2 Dall 86, 2 U.S. 86, 1 L.Ed. 300;

Shannon v. United States, 10 Cir., 76 F.2d 490; R.I. Recreation Center v. Ætna Casualty & Surety Co., 1 Cir., 177 F.2d 603, 12 A.L.R.2d 230.

Appellant seriously contends that however correct the instruction might be in an ordinary case where a person accused of crime committed in his own country claims to have been coerced by an individual, the instruction of the court was in error particularly in its requirement of apprehension of *immediate* and impending death, or of *immediate* bodily harm, in a case where the accused person was in an enemy country, unable to get protection

criminal charged that the criminal act was not committed voluntarily but was the result of coercion, compulsion or necessity. There is really no technical distinction in the use of the terms coercion, compulsion and necessity when they are used to designate a defense in a criminal case, and they are often used interchangeably.

In fact, the terms coercion and compulsion are practically synonymous, although coercion is applied more accurately perhaps to the accomplishment of one's purpose by indirect means as threats or intimidation, and compulsion to the overcoming of one's will by means of force or physical restraint.

The term necessity has various meanings in the law, but in the sense of a defense of crime, it has a general meaning of some unavoidable circumstance, condition or fact, which leaves no choice of action.

However, this doctrine of coercion, compulsion or necessity is hedged about with certain positive rules of law and is recognized only in clear cases. In order to excuse a criminal act on the ground of coercion, compulsion or necessity, one must have acted under the apprehension of immediate and impending death or of serious and immediate bodily harm.

Fear of injury to one's property or of remote bodily harm do not excuse an offense. That one commits a crime merely because he or she is ordered to do so by some superior authority, is, in itself, no defense, for there is nothing in the mere relationship of the parties that justifies or excuses obedience to such commands.

Moreover, the force and fear, in order to constitute a defense in a case of treason, must continue during all the time of such service with the enemy, and one who makes force his defense must show that he or she left the service as

soon as he or she could. In other words, ladies and gentlemen of the jury, this coercion or compulsion that will excuse a criminal act must be present, immediate and pending, and of such a nature as to induce a well grounded apprehension of death or serious bodily injury if the act is not done.

If you believe from the evidence that the defendant committed these acts that the Government alleges to be of a treasonable character under a well grounded apprehension of immediate death or serious bodily injury to be inflicted by any particular person or agent of the Japanese government, and those facts are substantiated by the evidence in this case, you would be warranted in finding that the defendant committed the alleged acts under coercion and compulsion, and under those circumstances it would be your duty under the law to return a verdict of not guilty.

The fact that the defendant may have been required to report to the Japanese police concerning her activities is not sufficient. Nor is it sufficient that she was under surveillance of the Kempei Tai. If you find that she, in fact, was under such surveillance, it is not sufficient that the defendant thought that she might be sent to a concentration or internment camp or that she might be deprived of her food ration card.

Neither is it sufficient that threats were made to other persons and that she knew of such threats, if you find, in fact, that such threats were made to her knowledge.

Nor is it sufficient that the defendant commenced her employment with the Broadcasting Corporation of Japan and continued that employment and committed the acts attributed to her merely because she wanted to make a living."

from the United States and where the compulsion is on the part of the enemy government itself. The contention is that under these circumstances the requirement of "immediacy" in the court's instructions was error. Appellant makes her point by quoting from East's Pleas of the Crown, (1806, pages 70 to 71), as follows: "But if the joining with rebels be from fear of present death, and while the party is under actual force, such fear and compulsion will excuse him. It is incumbent, however, on the party setting up this defence to give satisfactory proof that the compulsion continued during all the time that he staid with the rebels. It may perhaps be impossible to account for every day, week, or month; and therefore *it may be sufficient to excuse him if he can prove an original force upon him,* that he in earnest attempted to escape and was prevented, or that he was so narrowly watched, or the passes so guarded, that *an attempt to escape or to refuse his assistance would have been attended with great difficulty and danger;* and if the circumstances will admit of it, that he quitted the service as soon as he could: *so that upon the whole he may fairly be presumed to have continued amongst them against his will, though not constantly under an actual force or fear of immediate death.*" (Italics supplied by appellant.)

However appropriate such quoted language might be in the case of a person impressed into military or naval service of the enemy, we think that under the circumstances here there was no occasion for departing from the ordinary rules applicable to the defense of duress and coercion. We know of no rule that would permit one who is under the protection of an enemy to claim immunity from prosecution for treason merely by setting up a claim of mental fear of possible future action on the part of the enemy. We think that the citizen owing allegiance to the United States must manifest a determination to resist commands and orders until such time as he is faced with the alternative of immediate injury or death. Were any other rule to be applied, traitors in the enemy country would by that fact alone be shielded from any requirement of resistance. The person claiming the defense of coercion and duress must be a person whose resistance has brought him to the last ditch.

In this same connection, appellant claims that the court erred in failing to give her requested instruction that she was an enemy alien of Japan. This instruction did not advise the jury as to what the legal consequences would be of appellant being in that category. The requested instruction did no more than furnish the jury a new name for persons in her position. We think that the failure to add this terminology to the instructions cannot have been prejudicial, for the jury was fully informed as to the precise situation of the appellant and their deliberations could not have been aided by supplying them with an additional name for her status.

In support of this defense of coercion, appellant testified that one Takano, her civilian superior, informed her that she was "to take army orders * * * you know what the consequences are * * *." She undertook to give this statement significance by testimony as to atrocities inflicted by the Japanese upon certain internees and prisoners of war who disobeyed military orders. The testimony relating to the statement of Takano is the only evidence in the record which would appear to support the giving of an instruction with respect to duress or coercion. Appellant testified that she was not forced to take her position at Radio Tokyo and said that she did not broadcast because of any actual physical coercion or threats thereof. The only qualification of this testimony was the statement of Takano which she testified was made to her before she began her broadcasting activities. She testified that she was not mistreated by the Japanese police. She performed her duties as script writer and announcer for the Zero Hour from November, 1943, until August, 1945. During this period she had pay raises; she was allowed the usual American holidays, and occasionally she absented herself from the broadcasting for considerable periods of time. These absences did not result in any immediate or drastic measures from her employers. On those occasions she ignored verbal and written demands to return to

work and did so with impunity and only returned to work when a Japanese official called upon her. There is no evidence of any determined refusal on her part which might have provoked coercion or brought about immediate and actual danger to her. In other words, there is no evidence that the appellant ever so conducted herself as to bring about a demonstration that death or serious and immediate bodily harm was to be apprehended for a refusal.

Appellant was permitted to introduce a vast amount of testimony which she says was in support of her claim that she operated in fear and under apprehension of harm to herself. Thus, she testified that during her stay in Japan after war began, she was interrogated by the police and was kept under constant surveillance by them. Her living quarters were searched by the police and she was required to obtain permission to move from place to place. She asked to be interned but this was denied her. She also testified that her neighbors, other civilians, were suspicious of her; that she was under fear of mob violence from the Japanese populace. In addition there was received evidence of atrocities practiced on the prisoners of war by the Japanese and evidence that for refusal by prisoners of war to obey orders the penalty of death was inflicted. Other witnesses called by appellant testified to instances in which guards killed prisoners in cold blood and tortured and beat others. Some prisoners of war had been compelled by threats of death or other violence to participate in the operation of the Zero Hour broadcast. In general these experiences relating to such prisoners and to other victims of atrocities were communicated to the appellant.

Appellant says that the court erred in giving the last three paragraphs of the instruction quoted in note 11, supra, to the effect that the fact that she was required to report to the Japanese police was not sufficient; that surveillance of the police was not sufficient; that threats made to other persons were not sufficient, etc. Appellant asserts that by this portion of the court's instruction it emasculated all of this background testimony which was designed to disclose that appellant was operating in an atmosphere of terror.

In order to consider the propriety of the instruction here complained of it is necessary to understand the very wide scope which the court permitted appellant's testimony to take. Although a strict following of the rule laid down in Gillars v. United States, supra, would have excluded evidence of threats or duress against others who participated in the Radio Tokyo broadcast, the trial court here allowed great latitude to appellant's counsel in placing in the record evidence of sundry atrocities committed by the Japanese against persons other than the appellant.

When appellant began her work on the Zero Hour at Radio Tokyo, she came in contact with three prisoners of war who had broadcasted at this station for a considerable period of time before she was employed there. These were a Major Cousens, an Australian prisoner; Captain Ince, an American prisoner; and Lieutenant Reyes, a Filipino prisoner. Appellant was permitted to testify as to accounts which were given her by these prisoners of war of the manner in which the Japanese military had compelled each of them to participate in broadcasting activities and she was permitted to relate their stories to her of their harrowing experiences at the hands of the Japanese from the time they were taken prisoners. This included their accounts of torture and murder of other prisoners of war at Singapore, at Manila, and at Camp Bunka in Japan, where the prisoners whom the Japanese were using for broadcasting were kept. She testified that Cousens informed her that the Japanese were brutal and uncivilized; that they were sly and cunning and never to be trusted. Similarly, Cousens, Ince and Reyes were permitted to testify as to atrocities practiced on the prisoners of war and which they themselves related to appellant. Thus Cousens in telling appellant how he came to broadcast on the Radio Tokyo gave her an account of how the men were being starved, beaten and tortured; how an Australian prisoner had been beaten to death with a club for stealing a can of onions and a Chinese prisoner had been beaten and put

to death with the water torture because he went mad with hunger and tried to seize some food. Cousens related his experience in solitary confinement, his observation of Japanese guards murdering prisoners in cold blood for trying to seize food, and how the Japanese officers told the prisoners that the punishment for disobedience would be death.

Ince and Reyes testified to telling the appellant about being compelled to broadcast for Radio Tokyo because of threats against their lives. Reyes gave accounts of the beating to death at Manila of two of his co-workers in the Manila underground radio; he told of observing Japanese soldiers at Manila bayoneting civilians for hiding food, machine gunning civilians, and of seeing Major Ince beaten.

Ince testified as to atrocities committed against the prisoners confined at Camp Bunka. In addition, the appellant was permitted to testify as to police surveillance of herself and of the suspicion with which she was regarded by other Japanese in the neighborhood where she resided.

At the time this evidence was received, the court clearly indicated the theory upon which it was permitted to go in. The trial judge considered that such testimony was relevant as bearing upon the state of mind of the appellant. It is clear that the court considered and made it apparent to counsel and to the jury when the evidence was received that it had to do with the general question of whether the appellant had reasonable ground for apprehension of danger when she participated in the broadcast.[12]

■ It is our view that after the court had thus received at the instance of appellant this large volume of testimony none of which disclosed any direct duress or coercion against the appellant but which was relevant only as bearing upon the question of reasonable ground for apprehension on the part of appellant, it was proper for the court to give the instruction of which complaint is made. As we understand appellant's objection to it, it is not seriously urged that this portion of the instruction did not correctly state the law, but it is contended that it had the effect of leading the jury to disregard this evidence and of preventing it from considering its cumulative effect upon the mind of the appellant. It is suggested that the primary vice in the instruction is that it "did not tell the jury anything about the cumulative effect of the above elements or of all the elements on coercion." It is objected that the instruction was one-sided in telling the jury that each of certain items of evidence would be insufficient without mentioning the cumulative effect of a combination of all this evidence.

It is true that the court might have told the jury about the possible cumulative effect of all this atrocity evidence. It is clear that such a comment by the court would have been a comment upon the evidence which a federal court might properly make. Yet to hold that prejudicial error resulted from a failure to make such a comment would, we think, require an improper assumption of a degree of ignorance on the part of the jury with which we think the jury cannot properly be charged. We think that the record on the whole discloses that the jury was not misled as to the significance of the atrocity evidence received and that it must have understood that the evidence was received because of its bearing upon the question submitted in the instructions as to whether the coercion or compulsion was "of such a nature as to induce a well grounded apprehension of death or serious bodily injury if the act is not done."

All the requirements of fairness to the appellant were met when she was permitted to introduce such testimony and from it argue to the jury that it had a bearing upon

12. Illustrative of the court's ruling is the following: "Q. Did you on any other occasions tell the defendant that any of the other prisoners of war or any prisoner of war had been beaten? Mr. Knapp: Object to that, your Honor. The fact that whether the defendant knew what went on at Bunka has no bearing on this case, no bearing on her guilt or innocence one way or the other. The Court. It has to do with the state of mind. It might be remote. I will allow it. The objection will be overruled."

what she necessarily understood Takano to mean when he said: "You know what the consequences are."

■ Appellant requested the giving of the following instruction: "If you find that the defendant did the acts charged in the indictment, but entertain a reasonable doubt as to whether or not she was acting under fear of bodily injury, beating or the like, then you must find the defendant not guilty." This proposed instruction No. 98 was one of the 128 listed in the manner previously mentioned. There was no error in refusing to give this instruction not only because it omits the required element of immediacy in connection with her fear of bodily injury, but the element of reasonable apprehension of injury was adequately covered in the instructions as given.

It is noted that the charge (see footnote 11, supra), referred to coercion or compulsion present, immediate and pending "of such a nature as to induce a well grounded apprehension of death or serious bodily injury if the act is not done." The jury were told that if they believed that the defendant committed these acts "under a well grounded apprehension of immediate death or serious bodily injury, to be inflicted by any particular person or agent of the Japanese Government * * * [13] you would be warranted in finding that the defendant committed the alleged acts under coercion and compulsion, and under those circumstances it would be your duty under the law to return a verdict of not guilty."

■ In view of that instruction, we cannot hold the failure to give the requested instruction No. 98 quoted above to be prejudicial. The court may properly refuse requested instructions which, in substance, have been covered in the court's charge. May v. United States, 84 U.S.App. D.C. 233, 175 F.2d 994; Nye & Nissen v.

United States, 9 Cir., 168 F.2d 846, affirmed 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919. Elsewhere in the instruction the court charged the jury: "This brings us to a consideration of what effect, if any, duress, coercion or compulsion may have upon the acts of a person charged with a crime. You will note that during my charge to you I use the expression 'if you find that the defendant committed these acts', and, of course, that means that they must be in law, voluntary acts, that is, acts that were done purposefully, freely, and that they were intended and unconstrained." In our opinion, the instructions of the court contained on the whole an adequate statement of the law relating to duress and coercion, and they were in our opinion as favorable to appellant as she had the right to demand.

Appellant argues that although the court received some evidence of the character herein mentioned, it erred in refusing to admit additional evidence (1) of duress on others, some of which was communicated and some of which was not communicated to appellant, (2) that the entire broadcasting staff of Radio Tokyo was in a state of fear; and (3) that appellant's neighbors made unfriendly demonstration against her.

We have previously noted that the court received a substantial amount of evidence of this same character. Appellant asserts that since the question of her reasonable apprehension of danger could only be judged in the light of all the relevant circumstances that the jury could not properly consider her situation in respect to the claimed duress unless they were permitted to weigh the cumulative effect of all such evidence. Therefore, appellant says, it was error for the court to receive some items of evidence of this character and exclude others.

■ We have examined with considerable care the items of evidence thus re-

13. Appellant argues that it was error to use the words: "to be inflicted by any particular person or agent of the Japanese government", arguing that if she feared death or injury, it was not essential to establish which particular person or agent would inflict it. This contention is not open to appellant for the reason that when opportunity was given to make objection to the charge under rule 30 appellant did not state to the court any objection to the use of this language.

jected by the court.[14] It was within the discretion of the trial court in passing upon the admissibility of this atrocity evidence and related matters to hold that in order that it be relevant as bearing upon the state of mind of appellant, and upon the question of her reasonable grounds for apprehension, that it must have been communicated to her. Testimony of what happened to prisoners of war in South Burma in 1942 if not known to appellant would be of very doubtful significance in respect to any question before the court. Appellant argues that evidence of the treatment of prisoners of war by the Japanese, even although not communicated to appellant, would be relevant in showing that "the Japanese actually imposed the death penalty for trivial offenses; it tends to show fears well grounded that such a fate would also befall one in her position." We believe that the logical relevance of such testimony would be so doubtful that it was properly within the discretion of the presiding judge to draw the line where he did. The trial judge was in a much better position than any appellate court could be to determine whether this line of testimony was likely to get out of hand and mislead the jury unless held within reasonable bounds.

Had appellant been permitted to introduce evidence of Japanese atrocities and mistreatment of prisoners without limitations as to whether appellant knew or did not know of the circumstances related, it might well have led to a situation in which the jury were given the impression that appellant was undertaking to prove that all Japanese were cruel, savage and sadistic and hence that she had the right to fear them all. Thus appellant sought to introduce an exhibit "W" which purported to be the orders given to Wake Island prisoners, on the occasion of their being transported by boat to another prison camp. The substance of the regulations was to the effect that disobedience of orders and instructions by the prisoners would be punished with death. The regulations contained numerous specific prohibitions such as walking without permission; touching the boat's materials, wires, etc.; climbing ladders without order; running away from the boat; trying to take more food than allowed, etc. Even if appellant had known of these regulations, their relevance would be doubtful for her position as a civilian broadcasting employee was so different from that of a prisoner being transported by ship that this exhibit would be properly rejected in any event. As a bit of evidence of Japanese ruthlessness not communicated to appellant, it was clearly improper.

The greater part of the exclusionary rulings with respect to this type of evidence were made upon the simple ground that when offered it had not been shown that the incident sought to be testified to had been communicated to the appellant. When that situation appeared, the court properly held that a proper foundation for its introduction had not been laid.[15]

Since the court properly held that such evidence would be relevant only if

14. Appellant's failure to conform to Rule 20d has made her brief in many respects almost unintelligible. Had specifications been made in compliance with the rule each one relating to rejection of evidence would have quoted "the grounds urged at the trial * * * and the full substance of the evidence admitted or rejected * * *." Appellant's brief without stating the substance of the evidence rejected or of the grounds urged for its admission, merely throws at the court a mass of references to pages of the record. We have nevertheless examined them all with care.

15. The following portion of the direct examination of the witness Cousens illustrates the rule of the court in such cases: "Q. Were there any guards stationed there? [at a prison of war camp, Mergui South Burma; the time was around March, 1942] A. Yes, sir. Mr. Knapp: Your Honor, I object to this line of testimony. It has gone on for quite a while. [Following this objection the court heard an extensive argument on the point in absence of the jury. He then ruled]: The Court: I quite agree with counsel for the Government. It has to do with the order of proof. This proof that is going in now, the proper foundation has not been laid for it. It is in anticipation of conveying this message to the defendant. Do I make myself clear? Mr. Collins. Yes. I can do that if your Honor says we must show a connection. The Court: I think it is a problem of order of proof. This testimony may or may not be admis-

communicated to the appellant, the trial court's discretionary power to control the order of proof warranted his requirement that before such evidence be received it be established that the facts were communicated to the appellant.[16]

For this reason we think that numerous of the exclusionary rulings of which appellant complains were altogether proper.[17]

■ Other rejected evidence which appellant asserts should have been received was clearly irrelevant under any theory.[18]

Some of the objections to the court's rulings excluding offered evidence appear to be somewhat trivial.[19]

■] Another group of rulings complained of amounted to no more than a refusal of the judge to permit a repetition of testimony previously given by the same witness.[20] The sustaining of such objection cannot possibly be prejudicial.

Other rulings which are related to matters involving the order of proof were the sustaining of objections to certain questions

---

"sible at the proper time. It is not admissible at this time because the foundation has not been laid for it."

16. "Moreover, the court will often, where the facts would be highly improper if irrelevant, require the other facts, instead of being postponed, to be first offered, so as to ensure the presence of the proper foundation and leave nothing to the sanguine expectation of counsel. This, however, is rather a question of the order of presenting evidence." Wigmore on Evidence, 3d Ed. § 40, p. 433.

Concerning the court's discretionary power in respect to the order of proof, Cf. United States v. Montgomery, 3 Cir., 126 F.2d 151, certiorari denied 316 U.S. 681, 62 S.Ct. 1268, 86 L.Ed. 1754; Thiede v. Utah, 159 U.S. 510, 519, 16 S. Ct. 62, 40 L.Ed. 237.

17. These include refusal to permit Cousens to give the names of prisoners in Bunka; refusal to admit the testimony of Schenk as to threats to compel broadcasting; refusal to permit Cousens to describe how he was knocked about by a prison guard on one occasion; refusal to permit Cousens to testify as to whether a broadcast made by him on August 1, 1942, was made freely and voluntarily; refusal to permit Cousens to testify as to the condition of a demented American prisoner; refusal to permit Reyes to describe his mistreatment at Fort Santiago; refusal to permit witness Henshaw to testify as to treatment of Kalbfleisch; refusal to permit Parkyns to testify as to what caused him to broadcast at Radio Tokyo; refusal to permit various witnesses to testify as to cat and dog diet at Camp Bunka; refusal to permit witness Cox to testify as to how he was compelled to broadcast; refusal to permit Kalbfleisch to testify as to atrocities and living conditions at Camp Bunka; evidence asserted to show the entire Radio Tokyo staff was kept in state of fear proved no such thing but was solely an account of the

witnesses' personal experiences with the police.

18. Such were the questions as to the names of prisoners at Camp Bunka; the apparent physical condition of Cousens when appellant first met him; what Mr. Huga said to appellant when she said she was going to stick by the prisoners of war; whether Mr. Uno carried a sword when prisoners were transported from Bunka prison to Radio Tokyo; persons who objected to appellant having a Christmas tree and the activities in which neighborhood associations were engaged; what Mr. Okada said about Kempei-tai; living conditions at the Dai Hotel; whether Reyes said anything to appellant "of anything in Bulacan connected with stakes", which, during direct examination of Reyes, was brought out as follows: "Q. Did you make any mention to defendant at that time and place of anything in Bulacan connected with stakes? Mr. De Wolfe: Object to it as immaterial * * *. The Court: [after ascertaining that the word was 'stakes'], Objection sustained;" whether prisoners of war were in poor physical condition.

19. Thus complaint is made of the sustaining of objection to a question in the direct examination of Cousens: "Did you at any time tell the defendant the prisoners of war detained at Bunka were beaten by the Japanese?" The objection was that the question was leading and the objection was sustained. Immediately following this ruling the question was asked: "Did you on any other occasions tell the defendant that any of the other prisoners of war, or any prisoner of war, had been beaten?" Upon objection to this question the court made the ruling quoted in the footnote 121 above and permitted the answer.

20. Thus objection is made that the court improperly sustained an objection to the question propounded to appellant as to her version of what Captain Ince said

which were objected to as not proper cross examination.

It appears to us that the objections in these cases were properly sustained on that ground, and hence that appellant is in no position to allege prejudice.[21]

██ We conclude that there was no prejudicial error in the court's rulings with respect to the receipt of evidence of the character here discussed.[22]

## 10. Public trial.

██ The Government introduced exhibits 16 to 21 which were phonograph records made by persons recording and monitoring what was said on the Zero Hour broadcast when appellant was broadcasting. The exhibits were used for the purpose of identifying the sound of the appellant's voice. The records when played were inaudible without earphones and hence the Government provided about 40 earphones for the judge, jury, clerk, court reporter, appellant, counsel and members of the press. Appellant objected that this procedure denied her

a public trial in that the public spectators could not hear the exhibits.

A similar contention was rejected in Gillars v. United States, supra, and we think correctly. Essentially the records were exhibits and we think that appellant might as logically argue that she was denied a public trial because certain exhibits such as photographs, samples of handwriting, etc., although examined by the parties and by the jury were not passed around to the spectators in the courtroom. We think that the contention as to lack of public trial is wholly without merit.

## 11. Geneva Convention.

██ Appellant complains of the failure of the trial court to give instructions relating to the Geneva Convention and to the fact that under that Convention a nation at war may require its prisoners of war to perform "work indirectly related to the war effort." The claim was that if the jury should find that the broadcasting activities only indirectly related to the Japanese war effort then none of the overt acts charged

as to how he came to be working at Radio Tokyo. Appellant had previously testified at considerable length with respect to this identical matter. A similar ruling with respect to the further inquiry of appellant as to conversations with Cousens or Ince concerning their mistreatment at Bunka prison, operated merely to exclude a repetition of testimony previously given on her direct examination by the appellant. In like manner efforts were made unsuccessfully to elicit from appellant on her direct examination a repetition of testimony already given by her as to the discussion with Capt. Ince as to why he was broadcasting or writing script or as to the threats made against prisoners of war by one Major Tsuneishi.

21. Such as the question to Tsuneishi as to whether he had a sword on the table when he talked to Major Cousens on August 1, 1942; and the inquiry of the same witness as to what had happened to a certain British prisoner of war by the name of Williams and as to what happened to others at that time; and the ruling on cross-examination of witness Oki as to where Major Cousens was standing during Tsuneishi's interview with him.

22. A further example of the trivial character of some of the complaints made is furnished by the following extract from the record: "Q. What date was this? [When witness arrived at Bunka] A. About March or April 1944. It decreased by one when Lt. Kalbfleisch was taken to be executed about February. Mr. Knapp: I object to that. There is no proof that Lt. Kalbfleisch was executed * * *. Mr. Collins. He did not say he was executed. He said he was taken away to be executed. The Court: Let the statement go out and let the jury disregard it for any purpose in this case."

Complaint is made to the court's ruling with respect to the statement about Lt. Kalbfleisch. It appears to us that the court's ruling was correct for several reasons. First, the statement was not responsive to any question but was volunteered by the witness; next, since it is admitted that Kalbfleisch who testified at the trial was not executed, there is no foundation to disclose that the witness was qualified by knowledge to testify that Kalbfleisch was taken to be executed; finally, as previously indicated, there is no evidence that the incident was communicated to appellant and hence that the testimony was relevant.

could be an overt act of treason within the meaning of the Constitution.

The first difficulty about the application of the Geneva Convention to acts performed by appellant is that appellant was not one of the persons referred to in that Convention, which refers only to prisoners of war. Appellant was not in that category; she was an uninterned civilian.

 We think that the Geneva Convention did not change the law of treason. If the overt act performed by appellant was such as to give aid and comfort to the enemy, the fact that the the enemy could have legally demanded a similar act under the terms of the Convention is irrelevant. It is essential to the crime of treason that the overt act be committed with the intent to betray the United States. Appellant says that unless the act itself is criminal, "no intent can turn it into treason". Such is not the law. "The very minimum function that an over act must perform in a treason prosecution is that it show sufficient action by the accused, in its setting, to sustain a finding that the accused actually gave aid and comfort to the enemy." Cramer v. United States, 325 U.S. 1, 34, 65 S.Ct. 918, 934, 89 L.Ed. 1441. The overt acts in the Haupt case (Haupt v. United States), 330 U.S. 631, 67 S.Ct. 874, 91 L.Ed. 1145, consisted of the accused's furnishing food, lodging, transportation and employment to his son. Certainly these acts of parental solicitude are not criminal. However, the fact the son was a German saboteur, known as such to his father who had expressed his admiration for the Nazis and antipathy towards the United States, in addition to these overt acts, were held to constitute sufficient basis to sustain a conviction for treason. We think the court did not err in its ruling upon this point.

12. Claimed misconduct of prosecutor.

Appellant asserts that on numerous occasions during the trial, Government counsel were guilty of such serious misconduct that the record in respect to this requires a new trial. These claims of misconduct relate to alleged misstatements of the record during the argument to the jury; alleged misstatements of the testimony of other witnesses which were incorporated in questions propounded to appellant and in arguments made to the jury asserted to exceed the bounds of propriety. Thus, it is said, that Government counsel in argument to the jury misstated overt act No. 6 as follows: "That was in October, 1944. Overt act 6. She unhesitatingly, unequivocally, denies broadcasting those words or anything like it. Well, you can understand why she refuses to admit the voicing of that broadcast. The government has produced not two witnesses, but five, who contradict her testimony. Mitsushio, George Mitsushio, Kenkichi Oki, Satoshi Nakamura, Clark Lee and Richard Henschel. Now this testimony from five witnesses that the defendant broadcast the incident about American ship losses after Leyte Gulf, concerning which five government witnesses testified. * * * ." It is said that this was misconduct, for one reason, because Clark Lee's testimony was merely with respect to his later interview with appellant in which appellant had stated to Lee that she had broadcast about the loss of ships, (which was the subject of overt act No. 6. However, the testimony of Lee was that the appellant's statement identified this broadcast as following the Battle of Formosa. The witnesses who gave direct testimony concerning overt act No. 6 had identified it as a broadcast following the Battle of Leyte Gulf.

It is asserted that it was misconduct for the prosecutor thus to list Clark Lee as a fifth witness to overt act 6. When the argument was made, it was challenged by counsel for appellant who assigned it as misconduct and requested the court to direct the jury to disregard it. Thereupon the court told the jury that argument is not evidence; that the matter of evidence was entirely with the jury; that they had heard the evidence, and that it was for them to take action on that evidence. In addition, the court in its general charge to the jury, told them: "You should distinguish carefully between what has been testified by the witnesses and what has been stated by the attorneys. Statements and arguments of counsel are not evidence in the case." Again the jury were charged

in great detail that in order to establish an overt act the minimum proof necessary is the direct evidence of the overt act given through the testimony of at least two witnesses. In this connection the court charged the jury that persons who testified to out of court admissions of the defendant may not be counted as witnesses within the meaning of the constitutional requirement. The court further named the three witnesses who the jury were told had testified concerning the commission of overt act No. 6.

It appears to us that what the prosecutor was here arguing was merely that although appellant had denied making any such broadcast about the loss of ships at any time whatsoever, she had been contradicted by five witnesses including Clark Lee. Prosecutor proceeded to read verbatim the testimony of Clark Lee on this point.

 The trial judge had an opportunity far superior to that afforded us to judge whether the remarks of counsel in the setting in which they were given constituted such misconduct as to require a more emphatic admonition or instruction to the jury to disregard. Manifestly the argument in question was but a momentary phase in an extended argument which concluded a three months' trial. Our system of adversary procedures in the trial of cases is designed to arrive at the truth by encouraging vigorous prosecution and defense. The making of arguments by counsel which are sometimes unwarranted by the evidence is commonplace as counsel are frequently carried away by the ardor of advocacy and the excitement of trial. If every remark of counsel outside the record were ground for reversal few verdicts would stand. Our system of jurisprudence properly makes it a matter primarily for the discretion of the trial court to determine whether prejudicial misconduct has occurred. An appellate court will not review the exercise of the trial court's discretion in such a matter unless the misconduct and prejudice is so clear that it can be said that the trial judge has been guilty of an abuse of discretion. We think that such cannot be said with respect to the incident here referred to.

For the reasons we have just expressed we are satisfied that we cannot upon this record hold that the trial judge was guilty of reversible error in the manner in which he dealt with the other claims of misconduct of the prosecutor in the course of his argument to the jury.

 Thus, it is argued that a certain exhibit 52 was offered and received solely for the purpose of impeachment of a defense witness, and in his argument to the jury one of counsel for the prosecution attempted to assert that it constituted substantive evidence of the facts recited in the exhibit.

This exhibit was a statement in writing which the witness Reyes had previously given to an officer of the Federal Bureau of Investigation. Reyes had testified on behalf of appellant that he with Cousens and Ince had undertaken to sabotage the propaganda programs of Radio Tokyo and that they secured the aid of appellant in so doing. The exhibit in question contained statements which tended to contradict that testimony. The prosecutor argued to the jury as follows: "Reyes' statements that he made to members of the FBI are quite illuminating. He made a statement on October 2nd, 1948. It is Government's Exhibit No. 52, I think, I will read the entire statement to you ladies and gentlemen. I think it is a very important piece of evidence in this case. Proves conclusively that there was no sabotaging of the program." Appellant asserts that this was an improper argument that the exhibit proved substantive facts in the case, and that such argument was misconduct.

We think that it cannot be demonstrated that the argument had that effect. We believe it was not out of order for counsel to assert that the prior contradictory statement was "quite illuminating". We also think that it could properly be argued that the making of the prior contradictory statement proved that the facts were not as testified to by the witness upon his direct examination. That is all that the argument amounted to.

During the argument one of counsel for the Government made the statement that some of the prisoners of war might later

be put upon trial. Objection to the remark was made by counsel for appellant and the court was asked to instruct the jury to disregard it. The court granted the request and told the jury: "We are not concerned about any one that may or may not be prosecuted. So you may disregard that for any purpose in this case."

Also during the argument Government counsel in quoting the testimony of one Sugiyama stated that the latter had testified that he heard the appellant broadcast: "You must be lonely out there. It is very uncomfortable out there." At the conclusion of this argument counsel for appellant stated to the court, "We assign as misconduct and ask that the jury be instructed to disregard as being a distortion of the evidence the statement that Harris Sugiyama quoted here as saying 'you must be lonely out there' * * * and stopping there; the full quotation is: 'You must be lonely out there. Let me cheer you up with some music.'"

This correction of the quotation and request for an instruction was made in the presence of the jury and was followed by some additional objections as to portions of the Government's argument. The court then immediately said to the jury: "I will indicate to the jury at this time that the argument is not evidence. The matter of evidence is entirely with the jury. They heard the evidence in this case and it is for them to take action on that evidence."

This statement of the court, as indicated, alluded to the objection of appellant quoted above and also to the appellant's request "that the jury be instructed to disregard the argument that this case should serve as a warning to others." This referred to the prosecutor's argument that "This matter should serve as a warning to others that they cannot, in our great hour of peril, desert their country and with impunity adhere to the enemy—and not, if the United States survive, be brought to book before a federal court of justice."

We have previously quoted from the general charge to the jury the instruction to distinguish between testimony and argument. The court added: "You must consider only evidence before you. That evidence consists of sworn testimony of witnesses with the exhibits which have been received in evidence, all facts which have been stipulated or agreed to by counsel, and all applicable presumptions stated in these instructions. * * * Remember also that the question before you can never be whether the Government wins or loses the case. The Government always wins when justice is done regardless of whether the verdict be guilty or not guilty."

We think that under these circumstances it cannot be said that there was any misconduct of Government counsel of such character as to require a new trial. Cf. Holt. v. United States, 218 U.S. 245, 250, 31 S.Ct. 2, 54 L.Ed. 1021. The remarks complained of were, all taken together, but brief and isolated portions of a six hour argument concluding a three months' trial. We are in no position as an appellate court to find the rulings made by the trial court inadequate to assure a fair trial. Cf. Johnston v. United States, 9 Cir., 154 F. 445, 449; Mellor v. United States, 8 Cir., 160 F.2d 757, 765; Stephan v. United States, 6 Cir., 133 F.2d 87, 99; Dunlop v. United States, 165 U.S. 486, 498, 17 S.Ct. 375, 41 L.Ed. 799; Crumpton v. United States, 138 U.S. 361, 364, 11 S. Ct. 355, 34 L.Ed. 958.

Other claimed instances of the prosecutor's misconduct have to do with certain cross or re-cross-examination of the appellant. Thus it appears that upon re-cross-examination, Government counsel referring to Government's exhibit 5 and defendant's exhibit B–P, repeatedly endeavored to get the appellant to admit that she never applied for reestablishment of her citizenship. It is argued that the exhibits themselves disclosed a letter written by appellant to American Consular Service referring to an application for reestablishment of her American citizenship. In alluding to this examination, appellant says that the prosecutor "browbeat" appellant through six pages of coercive, bullying cross-examination. We think that the most that this portion of the record discloses was that the prosecutor was proceeding up the wrong alley, for he got nowhere by this cross-examination. The witness was

not misled and the whole effort amounted to nothing. Nor is there anything in this cold record to indicate that the trial judge should have assumed that in this futile effort the prosecutor was proceeding dishonestly or in bad faith.

The other alleged instances of misconduct of the prosecutor in cross-examination of the appellant appear to us to be petty and too clearly without merit to warrant more extended discussion.[23]

### 13. Cross-examination of defendant-appellant.

Appellant complains of several rulings on the testimony given during the time that she was under cross-examination by Government counsel. On a number of occasions during her cross-examination with respect to matters on which her testimony had differed from that of other witnesses, she was asked if she heard the testimony of a certain Government witness upon that point. When she replied that she had heard such testimony and that it was in disagreement with what she was then saying, appellant was asked if the other witness was in error.[24] She now urges that it was error for the trial court to permit such questions to be asked on the ground that it is improper to ask one witness to pass on the truth or falsity of testimony of another witness.

Undoubtedly the rule thus stated is one of general application and supported by authorities. But we think it has no application to the facts here. Essentially what happened here was not an attempt to procure the opinion of one witness as to the veracity of another witness; what was sought was to point up the contradiction in the appellant's testimony for the purpose of more effectively bringing that contradiction to the attention of appellant and of the jury as part of the cross-examination. When the appellant herself took the stand and undertook to testify upon direct examination concerning these sundry subjects, she subjected herself to cross-examination on behalf of the prosecution as fully as any other witness in the case. Powers v. United States, 223 U.S. 303, 315, 32 S.Ct. 281, 56 L.Ed. 448; Shipley v. United States, 5 Cir., 281 F. 134, certiorari denied 260 U.S. 726, 43 S.Ct. 89, 67 L.Ed. 483.

The right to cross examine a witness is fundamental in our judicial system. Vigorous and searching cross-examination is a powerful instrument for the ascertainment of truth. Appellate courts, particularly, are loath to lay down rules which might unduly restrict the latitude of cross-examination. The proper limit of fair cross-examination is a matter within the sound discretion of the trial court. Austin v. United States, 9 Cir., 4 F.2d 774, 775; Land v. United States, 4 Cir., 177 F.2d 346, 350.

We think that the method of cross-examination adopted by the prosecutor in this case was proper. Certainly the rulings of the court below cannot be said to evidence an abuse of discretion. Appellant is unable

---

23. Objection is made that in interrogating appellant about her conversation with a Mr. Kuroishi about "the job" at Radio Tokyo, the prosecutor had given the impression that defendant was applying to Kuroishi for a job as announcer instead of applying, as she did, for a job as a typist. It is objected that in cross-examining appellant, the prosecutor stated to her that she had testified the day before that she gave some 40 radio scripts away. The record shows the appellant clearly explained that the number of complete scripts she had was 15 or 20 and that her reference to autographing 30 or 40 was not merely to scripts but to other objects including Japanese money. Another claim is that in cross-

examining appellant the prosecutor improperly quoted Cousens as having said that he had opposed the Allied policy of unconditional surrender, where the true state of the record was that Cousens had merely said that he had written scripts which "had to do" with unconditional surrender.

24. Appellant says that typical of this line of cross-examination was the following: "Q. And after you were married, you told Chiyeko Ito that you were still an American? A. I didn't tell her anything about my citizenship status. Q. You heard her testify here that you did tell her that, didn't you? A. Yes. Q. She was in error, wasn't she? A. Her recollection was wrong."

to demonstrate any prejudice to her arising out of the rulings of the trial court upon these questions. Cf. United States v. Buckner, 2 Cir., 108 F.2d 921, 929, certiorari denied 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016.

Another claim of improper cross-examination of appellant relates to the inquiries addressed to her as to overt act No. 8. Counsel for appellant objected to the cross-examination upon this point on the ground that it was improper as relating to matters that were not touched upon on direct examination of the witness. We think that appellant's contention is based upon a misunderstanding of the proper scope of cross-examination. Appellant had given testimony in her direct examination designed to show both directly and circumstantially her good intent and her lack of intent to betray the United States. Thus the whole question of appellant's intention was open to inquiry upon cross-examination and the cross-examiner was entitled to bring up for examination any matter which rightly had a bearing upon intent. The intent necessarily had to be gathered from the acts and conduct of the appellant. Chandler v. United States, supra, certiorari denied 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081. If she participated in overt act No. 8 that fact would have an important bearing upon her intent and would be material because of the inferences properly drawn from it. Austin v. United States, 9 Cir., supra; Diggs v. United States, 9 Cir., 220 F. 545, 563, af-firmed 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442.

Within the compass of some seven pages of her brief, appellant lists what she calls a "long procession of errors" and a "torrent of improper questions", all relating to cross-examination of appellant. Notwithstanding these same pages contain some of the most flagrant failures to comply with the rule relating to specification of errors, and the appellant has here wrapped up in a small bundle a very long list of complaints which have been dumped into the lap of the court, we have painstakingly examined each one and conclude they are without foundation and relate to matters which in our opinion cannot possibly be prejudicial.[25]

### 14. Cross-examination of appellant's witnesses.

Appellant makes numerous objections to the rulings of the trial court as to the scope of cross-examination of certain defense witnesses. One of her witnesses, Ito, testified about many conversations she had with appellant during the latter's stay in Japan. The direct examination was designed to disclose appellant's loyal attitude toward the United States. Upon cross-examination the witness was asked whether appellant had talked about her work at Radio Tokyo and thereupon these portions of the conversations were developed by questioning the witness.

25. Reference is to a question as to whether appellant ever regained Japanese nationality. Since appellant had spoken of this subject in her letter, exhibit 5, the inquiry was relevant and it was proper cross-examination because of her testimony as to her citizenship. Another complaint is to the inquiry as to what appellant thought the Japanese militarists were thinking. In view of her extensive testimony concerning Japanese atrocities and the bearing they had on her own thoughts and fears, we think the question a proper one. Another complaint is the interrogation of appellant as to whether she told her husband she was a Portuguese national. It is asserted the communication was privileged and confidential. But previously appellant had put her husband on the stand and interrogated him as to conversations with her regarding her nationality. Thus she waived the privilege. Objection is made to the question put to her asking if she knew that all the Japanese radio programs were Japanese propaganda. It is asserted this improperly called for a conclusion. Frankly, we see no reason why the inquiry was not properly put on cross-examination. It is objected that the prosecutor unduly repeated the same question on cross-examination over and over again. It is fundamental that repetition is not a legitimate objection on cross-examination and it is elementary, too, that in a case of this kind the placing of limits to repetition must be left to the discretion of the trial court.

If parts of the conversations were given upon the issue of intent, it seems obvious that other contemporaneous conversations bearing on the same subject could be properly developed on cross-examination. Counsel cannot bring out favorable parts of a conversation and then preclude his opponent from developing on cross-examination the unfavorable parts.

It is complained that in cross-examination of appellant's witness Reyes, the prosecutor insisted upon a yes or no answer and refused to afford the witness an opportunity to explain the answer given. There is no basis in the record for this contention. Reyes admitted during the trial that portions of his sworn testimony were false and he was given an opportunity not only to explain his answers but to explain why he had given false testimony. Other faults were found with the cross-examination of Reyes but we find the contentions without merit.

Objection is made to the fact that Government counsel in cross-examining appellant's witness, Ince, referred to appellant as a Japanese. The question was: "Now the defendant was not the only Japanese with whom you were friendly, was she?" It was objected that the question was highly improper and that there was no evidence that the defendant was Japanese. It is asserted that this was an appeal to race prejudice and denied appellant a fair trial. Since appellant was present in court, and since her ancestry and racial origin were admitted and testified to by her, we find no prejudicial error in permitting the asking of the question.

15. Limitations placed upon cross-examination on behalf of appellant.

Appellant lists a number of respects in which she says that the court unduly restricted her cross-examination of certain Government witnesses. After the witness Clark Lee had testified on direct examination as to what appellant had told him during his interview of her understanding of the purpose of the Zero Hour, and that she had said that she understood that the purpose of that broadcast "was to make them homesick and unhappy about sitting in mud", counsel for appellant asked Lee on cross-examination if Lee had not stated in a book written by him that appellant's programs were entertaining to the troops. We think that the objection was properly sustained. It would have been proper to impeach Lee by proof of prior statements which contradicted his direct testimony, but his direct testimony had nothing to do with his own opinion of appellant's broadcast. What Lee said in his book about the entertainment value of appellant's broadcast in no manner tended to contradict his direct testimony as to what appellant told him when he interviewed her.

Equally groundless is the complaint as to the sustaining of an objection to questions put to Lee as to whether a certain Colonel Munsing told Lee in Tokyo that "Tokyo Rose" was a Canadian girl. Aside from being obvious hearsay the statement was without value for want of any testimonial foundation.

Complaint is made that the court refused to allow counsel for appellant to ask Lee if appellant could possibly have obtained counsel at the time she, in the presence of her husband, had her interview with Lee. The question was objectionable for the matter was irrelevant and immaterial. It was admitted that no counsel was present at the time. To ask Lee whether it would have been possible for her to obtain counsel was to seek the sort of speculative conclusions which appellant was not entitled to ask the witness.

Appellant complains she was not allowed to ask the Government witness Henschel whether he had an opinion as to appellant's guilt or innocence. Appellant asserts that she had a right to ask this question for the purpose of demonstrating the witness' bias. The right to demonstrate bias of a witness is unquestionable, but the interrogation in this instance was not designed to demonstrate either bias or lack of bias. Moreover, the inquiry was highly objectionable because it sought a conclusion from a witness upon the question which was exclusively within the province of the jury.

One Nii was a Government witness. On cross-examination he said he did not remember what he said to appellant's counsel in an interview in Japan in the spring of 1949 because both parties were drinking and he and the attorney were both intoxicated. On redirect examination the witness testified that the liquor on the occasion in question was furnished by appellant's attorney. On re-cross-examination Nii was asked how much liquor he customarily consumed during the spring of 1949. Objection to this inquiry was sustained and the appellant claims such was error.

To have permitted this inquiry, which at most might have developed that Nii was a heavy drinker, would have been an attempt to impeach the witness by proof of particular acts of misconduct. Shively v. United States, 9 Cir., 299 F. 710, 713, certiorari denied 266 U.S. 619, 45 S.Ct. 99, 69 L.Ed. 471. In any event, Nii's drinking habits would have so little relation to what transpired upon the occasion of the interview that the court's refusal to permit the inquiry cannot be said to be prejudicial.

Other complaints of limitations in cross examination relate to refusal to permit appellant to ask Government witness, Villarin, the names of Japanese officers who had threatened him, and to the refusal to permit cross examination of Government witness Hall as to whether he heard broadcasting from a Japanese station at Rabaul. As neither inquiry was proper cross examination the ruling in each case was correct.

### 16. Miscellaneous rulings on evidence.

Through the deposition of one Saisho, the appellant sought to impeach three Government witnesses by reputation evidence. In respect to two of these witnesses the inquiry fixed no locale for the reputation. None of the questions fixed any time for the existence of the reputation inquired about, and in each case the inquiry was with respect to the reputation of the witness with reference to "truth, honesty, and integrity".[26] The common rule is that the inquiry should be limited to the traits involved, namely, "truth and veracity". Powell v. United States, 9 Cir., 35 F.2d 941, 942. For the reasons stated in the last cited case we think that the trial court's ruling was correct.

Complaint is made of the exclusion of a number of questions propounded to the appellant which so clearly called for hearsay evidence that extended discussion of the points made is not warranted here.[27]

26. This form of question used by counsel for appellant is authorized by statute in California. C.C.P. Sec. 2051. See People v. Markham, 64 Cal. 157, 163, 30 P. 620, 623: "The section of the Code as to reputation for truth is but declaratory of the common-law rule". The California Code provision is not made applicable to Federal criminal procedure. See Rule 26, F.R.Crim.P. The whole question is discussed in Wigmore, 3d Ed. Sec. 923, p. 450. The better rule is that the traits to be inquired about should be left to the trial court's discretion. Gage v. United States, 9 Cir., 167 F.2d 122, 125.

27. An attempt was made to have appellant testify that she was told by a party that her voice did not sound like the voice the party had heard in the South Pacific. Appellant attempts to argue that such remark was within the "spontaneous exclamation" rule. The circumstances here do not permit such a conclusion.

Also defendant was not permitted to testify as to conversations between herself and Brundidge. It is argued that there was prima facie evidence that Brundidge had gone to Japan with one Hogan on behalf of the United States and therefore that anything Brundidge said would be binding upon the United States. A similar contention is made with respect to a conversation with one Major Swanson who was jailer in charge of the prison in which appellant was interned. The argument was that he was an agent of the United States and that his statements were binding upon the United States. It is elementary that even if agency is proven, the agent's remarks are not binding upon the principal unless there is foundation to prove that the agent had express or implied authority to speak on behalf of the principal. Apparently in appellant's view, the United States would be bound by the remarks of anyone on the Government payroll.

█ Other rulings on the admission of evidence offered by the appellant were so clearly proper that the mere statement of the offered evidence discloses its impropriety.[28]

17. Evidence that appellant's broadcasts were harmless.

█ Appellant offered certain evidence designed to show that the effects of her broadcasts were either beneficial to the morale of American armed forces or at any rate were harmless. That a traitorous plan does not have the desired effect is immaterial. Chandler v. United States, supra. Cf. Gillars v. United States, supra; Haupt v. United States, supra, 330 U.S. at page 644, 67 S.Ct. at page 880.

A further reason for the rejection of this evidence is found in the character of the rejected testimony itself.[29]

18. Claimed evidence of fraud in preparation of Government's case.

Appellant undertook to prove that there was fraud in the preparation of the Government's case. This appellant says, she was prepared to prove through showing first, that certain subpoenas to Government witnesses were fraudulently issued, and second, that one Brundidge on behalf of the Government had bribed or attempted to bribe Government witnesses.

█ In our opinion the proof offered would have no tendency to establish any claim of fraud. It was intended to prove that although the trial, originally set for May 16 was postponed to July 5, 25 Government subpoenas required certain witnesses to appear on June 27, 28, 29 or 30. Even if the subpoenas had been admitted, they would have no tendency to show fraud, rather than mistake or oversight, and in any event, the witnesses were the only persons that could complain. Sachs v. Government of the Canal Zone, 5 Cir., 176 F.2d 292, 296.

As for Brundidge, his claimed unsavory conduct was offered to be proven only by hearsay evidence and the offered evidence that his trip as a newspaper man accompanying a Department of Justice attorney

28. Thus for the purpose of impeaching the testimony of certain American veterans who were Government witnesses and who identified the appellant's voice and testified as to the contents of appellant's broadcast, the appellant sought to introduce evidence of rumors afloat among the armed forces as to things allegedly coming over the radio from "Tokyo Rose". The theory appears to have been that since many rumors were afloat, the Government witnesses might have heard those rumors and might have such rumors and their recollections mixed up. Again appellant sought to introduce evidence as to broadcasts coming from numerous other Japanese stations including Manila, Gilbert Islands and Leyte. The purpose was to show that the witnesses may have been listening to these other broadcasts. The evidence excluded was as to the contents of numerous other broadcasts by other persons far distant from Tokyo. They were not shown to have been at the Zero Hour time, and in view of the fact that appellant was permitted to disclose that there were Japanese broadcasts from many different points, we cannot observe the materiality of the contents of the broadcasts here excluded.

29. It was sought to introduce oral testimony as to the contents of certain confidential army bulletins relative to the success of appellant's broadcast. The absence of the bulletins themselves was not accounted for.

Another part of this evidence was an exhibit which was a Navy press release containing a purported "citation" of appellant for the morale building contents of her broadcasts. Whether the document was intended as a joke or otherwise, it was plainly inadmissible as hearsay containing incompetent conclusions.

Appellant's witness Paul was prohibited from testifying that the music on the Zero Hour program and that on the armed forces radio program was substantially the same.

Appellant's rejected offer to prove that the American troops were never ordered not to listen to her program might serve to prove the opinion of the commanding officers, but it was clearly inadmissible here and its rejection was certainly not prejudicial.

was in part paid for by the United States and that he had an army permit reciting that he was on official business for the Department of Justice fell far short of disclosing that any of his acts of misconduct were within the course of the claimed employment.

### 19. Identification of appellant as Tokyo Rose.

Appellant says that she was prejudiced by the admission in evidence of exhibits 16 to 21 which were recordings of her broadcast bearing the notation on each that they were broadcasts by "Tokyo Rose". She says that the Government was attempting to label her as Tokyo Rose.

It appears that the persons who made the recordings identified them in the manner indicated. But there was no claim on the part of the Government that appellant broadcast as Tokyo Rose, and the marks upon the recordings were not relied upon to tie them to the appellant's broadcast. Their authenticity was proven by entirely different evidence. It was hardly more significant that the records bore the notation "Tokyo Rose" than would have been the case had the recordings been painted a particular color or been scratched in a peculiar manner.

■ It was not disputed that the appellant herself had chosen at times to refer to Tokyo Rose. We have mentioned the yen note. She also autographed a number of scripts of her broadcasts and gave them away to various persons marking them herself with a reference to Tokyo Rose. We think that the circumstances that the recordings bore this notation was in no way prejudicial to appellant.

■ Appellant tried to show that the name "Tokyo Rose" had been in circulation long before she began to broadcast. The witnesses by which appellant undertook to prove this had never heard broadcasts of the Zero Hour, and all that was sought from them was hearsay evidence that the appellation Tokyo Rose was in circulation in the early years of the war. Under the circumstances here, this was immaterial and the evidence by which it was sought to be injected in the case was incompetent.

### 20. Refusal to permit offers of proof.

Appellant rather bitterly complains that on many occasions when the court sustained objections to questions propounded by counsel for appellant, the court did not permit appellant forthwith to make offers of proof.[30]

■ If this court were to hold that appellant was precluded from claiming error in the sustaining of an objection to a question propounded on her behalf for want of an offer of proof, then the court's refusal to permit the offer to be made might well be prejudicial. It is of course elementary that an offer of proof is required where it is necessary to enable the appellate court to determine whether the excluded answer would have been such as to affect the substantial rights of the parties. Wigmore, Evidence, 3d Ed. Sec. 20, p. 357. But a formal offer of proof is not necessary where the record shows, either from the form of the question asked or otherwise, what the substance of the proposed evidence is. Cf. Meany v. United States, 2 Cir., 112 F.2d 538, 539, 130 A.L.R. 973; Clauson v. United States, 8 Cir., 60 F.2d 694, citing:

The rule cited in the Chandler case, supra, demonstrates the impropriety of appellant's requested instruction No. 60 to the effect that there is no direct evidence that any of the alleged overt acts aided Japan or weakened the United States.

30. The following is a sample of what is here referred to: "Mr. Collins: If your Honor please, since the court has ruled against us on the question of the admissibility of certain evidence, we would like to make an offer of proof concerning * * *. The Court: There will be no necessity of it. The Court has ruled and you have a record of everything that has occurred. There is no necessity to make an offer of proof. Mr. Collins: Your Honor is denying us the right to make an offer of proof on those grounds?' The Court: Let the record so show."

Buckstaff v. Russell & Co., 151 U.S. 626, 636, 14 S.Ct. 448, 38 L.Ed. 292.

■ The appellant has not found herself handicapped because of any holding on our part that an essential offer of proof was missing. In each instance called to our attention it is apparent that any conceivable answer would have been inadmissible.[31]

### 21. Question of appellant's inspection of reports by Federal Bureau of Investigation.

Prior to the trial, FBI agents Dunn and Tillman had interviewed defendant's witness Reyes. In the course of that interview they had procured the execution by Reyes of two writings subsequently introduced as exhibits 52 and 54. They also made inquiry of Reyes about his personal history which Reyes gave to them orally. They took notes of this conversation and subsequently made a report of this matter in accordance with their usual practice, and the notes were destroyed. This investigative report contained an account of Reyes' oral conversation about his personal history. No part of the record was used or referred to in the course of the testimony by the agents, either for refreshing memory or otherwise. While Tillman was on the stand counsel for appellant made the demand: "That the notes made by the Federal Bureau of Investigation agents * * * made to them or either of them on or about October 5, 1948 by Norman Reyes * * * be produced for inspection and examination and for use in examining * * * the witness Frederic Tillman who is on the stand." At the time Tillman had been called in rebuttal to testify as to the voluntary execution of exhibits 52 and 54.

■ We think that the correct ruling is that recited in Goldman v. United States, 316 U.S. 129, 132, 62 S.Ct. 993, 995, 86 L. Ed. 1322, to the effect that it is "the better rule that where a witness does not use his notes or memoranda in court, a party has no absolute right to have them produced and to inspect them." That case also held that under the circumstances here existing, whether the Government's files be produced should in general be a matter for the determination of the trial judge.

■ It is apparent that what was sought here was but a part of the work papers used by the prosecutor in preparing the case. There was a complete lack of showing that the papers in question were relevant for the purpose of impeachment. Cf. Arnstein v. United States, 54 App.D.C. 199, 296 F. 946. We think it cannot be said that in refusing to require production of this paper the court abused its discretion.

### 22. Refusal to produce defendant's witnesses from Japan.

Appellant filed a series of motions requesting the court to issue subpoenas to some 43 witnesses residing abroad requiring their attendance at the trial at the expense of the Government. After six such motions, a seventh motion requested that in the event of denial of the previous motions, the court provide for the taking of depositions at Government expense of witnesses residing abroad. This motion was granted and the others denied. The Government was thereupon required to defray the expense of taking the depositions and of appellant's attorneys' travel and subsistence expense for that purpose. Subsequently stipulations were made enlarging the list of persons whose depositions might be taken.

■ Substantially all of the persons for whom process was thus sought were not United States citizens and their attendance could not have been compelled. Cf. Blackmer v. United States, 284 U.S. 421, 52 S. Ct. 252, 76 L.Ed. 375; United States v. Best,

---

31. For example: whether or not Mrs. Ince and children were left in the hands of the Japanese; whether or not Capt. Kalbfleisch knew of his own knowledge that prisoners at Bunka Prison did or did not receive adequate food; whether or not witness Stanley in August, 1942, at Dutch Harbor, Alaska, had heard discussion among American troops concerning any lady known by the name of Tokyo Rose; whether or not appellant had demanded of the military authorities at Yokohama Military Stockade that she be given a speedy trial.

D.C., 76 F.Supp. 138, 139; 28 U.S.C.A. § 1783. In any event, the question of payment by the United States of fees and expenses of defense witnesses is one within the sound judicial discretion of the trial court. Meeks v. United States, 9 Cir., 179 F.2d 319; Dupuis v. United States, 9 Cir., 5 F.2d 231. Cf. Goldsby v. United States, 160 U.S. 70, 16 S.Ct. 216, 40 L.Ed. 343. We find no reversible error in the action of the trial court here referred to.

23. Instruction respecting overt act No. 6.

In the course of its charge to the jury, the trial court listed and sorted out the various overt acts charged in the indictment and stated to the jury: "The witnesses who testified regarding the commission of overt act No. 6 were George Mitsushio, Kenkichi Oki, and Shatoshi Nakamura." Appellant asserts that it was error for the court to tell the jury that Nakamura had testified to overt act No. 6 for the reason that while the other two witnesses mentioned had placed this act in October, 1944, Nakamura testified to a similar broadcast "in the fall of 1944". It is argued that since the fall of 1944 covers more than October, Nakamura might have been referring to a different incident. Appellant says that the jury should have been allowed to pass upon the question whether Nakamura did or did not testify as to overt act No. 6.

We think that the record does not sustain this argument. Nakamura testified as to a broadcast concerning a loss of ships. He was present in the studio and he heard the news broadcast concerning the battle of Leyte Gulf. Immediately thereafter the witness introduced the appellant. He described the news broadcast in the following manner: "Q. What did he say, Mr. Nakamura, everything to the best of your recollection that he said. A. Americans have lost many ships in the battle. Q. What battle? A. The Battle of Leyte Gulf." Immediately thereafter he took the microphone and said, "So much for the war news and here comes Orphan Ann". Thereupon appellant made the broadcast described by this witness. We think the circumstances thus demonstrated compel a conclusion that Nakamura was describing the same incident as the other two witnesses. The instruction was correct.

Since we find no prejudicial error in the record the judgment is affirmed.